IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>MARK S. MILLER<br>JAMILEH MILLER<br>    Debtors | Chapter 13<br><br>Case No.  10-25453-MER |
| MARK S. MILLER<br>JAMILEH MILLER<br>            Plaintiff,<br><br>    v.<br>DEUTSCHE BANK NATIONAL TRUST<br>COMPANY,<br>ARONOWITZ & MECKLENBURG, LLP<br>CITIMORTGAGE, INC.<br>AND ONEWEST BANK, F.S.B.<br>            Defendants. | Adversary No.<br>10-01757-MER |

MOTION TO DISMISS

COMES NOW, Defendants, Deutsche Bank National Trust Company, as Trustee of the

IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-

AR13 Under the Pooling and Servicing Agreement Dated May 1, 2006 ("Deutsche"), Aronowitz &

Mecklenburg, LLP ("Aronowitz") and OneWest Bank, F.S.B. (collectively hereinafter referred to

as "Defendants"), by and through their attorneys, Aronowitz & Mecklenburg, LLP, for their Motion

to Dismiss and in support thereof states as follows:

I. INTRODUCTION

Debtors are the owners of certain real property located in Arapahoe County, Colorado, which

is encumbered by a mortgage.  Subsequent to the execution of the mortgage by the Debtors, the

mortgage was conveyed to Deutsche. Subsequent to the execution of the mortgage by the Debtors, the Debtors fell behind on their mortgage payments resulting in the initiation of a foreclosure action by Deutsche. During the state court foreclosure proceedings, Debtors contested the state court foreclosure proceedings and specifically raised the defenses of real party in interest and standing. The state court found such defenses to be without merit and further held that Deutsche was the real party in interest and had standing. As such, the state court issued the order authorizing sale. Debtors filed a motion for reconsideration with the state court asserting that Deutsche lacked standing and was not the real party in interest. The state court denied the motion and reaffirmed that Deutsche was the real party in interest and had standing to initiate and maintain the state foreclosure action. Debtors filed for bankruptcy shortly thereafter, and despite the Bankruptcy Court's multiple rulings and advisements that it will not hear the issues of real party in interest and standing, Debtors continue to disregard this Court and further continue to assert that Deutsche is not the real party in interest and lacks standing. Since the complaint seeks to do nothing more than to overturn the state court's rulings on standing and real party in interest, the complaint must be dismissed for the reasons stated herein.

## II. UNDISPUTED RELEVANT FACTS

On April 20, 2006, Debtors, Mark S. Miller and Jamileh Miller, executed a promissory note ("Note") in the amount of $216,236.00 for the benefit of IndyMac Bank, F.S.B. A true and correct copy is attached hereto as Exhibit 1.

Paragraph 1 of the Note provides that the Debtors understand that IndyMac Bank, F.S.B. may transfer the Note and anyone who takes the note is entitled to receive payments as the "Note Holder".

On April 20, 3006, Debtors, Mark S. Miller and Jamileh Miller, executed a deed of trust ("Deed of Trust") to secure the Note by encumbering real property legally described as Lot 7, Block

4, Fox Hill Filing No. 4, County of Arapahoe, State of Colorado, which is known as 19733 E. Union Drive, Centennial, Colorado 80015.  A true and correct copy is attached hereto as Exhibit 2.

The Deed of Trust was recorded in the official records of Arapahoe County on March 19, 2007 at reception number B7034459, thereby perfecting the interest.

Paragraph 20 of the Deed of Trust provides that the Note or a partial interest in the note may be assigned or transferred without prior notice to borrower.

Subsequent to the execution of the Note and Deed of Trust, Deutsche became the holder of the evidence of debt.

Also subsequent to the execution of the Note and Deed of Trust, Mark S. Miller and Jamileh Miller defaulted under the terms of the Note and Deed of Trust by failing to make their monthly mortgage payments.  At the time the foreclosure action was initiated in February 2010, the mortgage was contractually due for the May 1, 2009 payment.

As part of the foreclosure process, Deutsche filed its Verified Rule 120 Motion for Order Authorizing Sale.  Debtors filed their response, and in that response, argued that Deutsche did not have standing to initiate or maintain the foreclosure action and was not the real party in interest.  A true and correct copy of the Debtors' response is attached hereto as Exhibit 3.

On May 3, 2010, the Arapahoe County District Court held a hearing.  At that hearing, Debtors had the opportunity to present their defense.  Debtors failed to present any evidence to refute Deutsche's prima facie case that it had standing, and was the real party in interest.  Accordingly, the Arapahoe County District Court ruled in favor of Deutsche, found Deutsche had standing and issued the order authorizing the Arapahoe County Public Trustee to sell the property pursuant to the power of sale contained in the Deed of Trust.

On May 4, 2010, Debtors filed their Motion for Hearing on Jurisdiction to reargue the issue of standing, and to further argue that the Arapahoe County District Court lacked subject matter jurisdiction.  A true and correct copy of the Motion for Hearing on Jurisdiction is attached hereto as Exhibit 4.

On May 6, 2010, the Arapahoe County District Court issued its written order authorizing sale and included specific notes that Deutsche had standing.  A true and correct copy of the order is attached hereto as Exhibit 5.

On May 7, 2010, Debtors filed their 2nd Motion for Hearing on Jurisdiction, again arguing that Deutsche lacked standing and based on that lack of standing, the Arapahoe County District Court lacked subject matter jurisdiction.  A true and correct copy of the 2nd Motion for Hearing on Jurisdiction is attached hereto as Exhibit 6.

On June 13, 2010, the Arapahoe County District Court denied the 2nd Motion for Hearing on Jurisdiction.  A true and correct copy is attached hereto as Exhibit 7.

On June 22, 2010, Debtors filed for Chapter 13 Bankruptcy *pro se*.

On August 23, 2010, Debtors argued before this Court that Deutsche lacked standing and was not the real party in interest during the preliminary confirmation hearing.  This Court advised Debtors at that hearing it would not hear the issue of standing as the issue of standing had already been decided by the Arapahoe County District Court.

Deliberately disregarding this Court's advisement, Debtors filed their Motion for Valuation of Security, Motion to Strike and Objection & Motion to Disallow to reargue the issue of standing and real party in interest.

As of the date of the filing of this Motion to Dismiss, the Court has only ruled on the Motion to Strike the objection filed by Deutsche, and denied the relief requested therein.

On October 19, 2010, Debtors filed their Adversary Proceeding Complaint for Recovery of Property, Fraud, Illegal Foreclosure, Fraudulent Transfer.

## III. LEGAL ARGUMENT

A.   Pro Se Plaintiffs

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted). The court should not be the *pro se* litigant's advocate. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). A dismissal "without affording the plaintiff notice or an opportunity to amend is proper only 'when it is patently obvious that plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile. Curley v. Perry, 246 F.3d 1278, 1281-82 (10th Cir. 2001) (quoting Hall, 935 F.2d at 1110 (additional quotation marks omitted)).

B.   Legal Standard

Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, a defendant may file a motion to dismiss a complaint for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6) (2009). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Dubbs v. Head Start, Inc., 336 F.3d 1194, 1201 (10th Cir. 2003). All well-pleaded factual allegations in a complaint

are accepted as true and construed in a light most favorable to the plaintiff or proponent.  Alvarado v. KOB-TV, LLC, 493 F.3d 1210, 1215 (10th Cir. 2007).  The court is to make all reasonable inferences in the plaintiff's favor.  Timpanogos Tribe v. Conway, 286 F.3d 1195, 1204 (10th Cir. 2002). Notwithstanding, the court is not required to accept legal conclusions or unwarranted factual inferences as true.  Mich. Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 533 (6th Cir. 2002); Moffet v. Halliburton Energy Servs., Inc. 291 F.3d 1227, 1232 (10th Cir. 2002); and PayoutOne v. Coral Mortg. Bankers, 602 F.Supp.2d 1219, 1223 (D. Colo. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, ____ U.S. ____, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable interference that the defendant is liable for the misconduct alleged."  Id.  In evaluating whether or not to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must engage in a two prong analysis.  First, the court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory.  Id., at 1949-51.  Second, the court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief."  Id., at 1951.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  Id., at 1950.

At the outset, Plaintiffs pled no facts which would allow the court to draw any reasonable inferences that the Defendants are liable for the misconduct alleged.  Rather, Plaintiffs make conclusory allegations that Defendants engaged in fraud, but there are no facts upon which a claim for fraud may be had or inferred.

Plaintiffs make the conclusory allegation that the foreclosure was illegal and must be

enjoined, but again, there are no factual allegations to support that there was anything illegal about the foreclosure.

At best, Plaintiffs argue that there was a false and/or fraudulent and nonexistent assignment. However, this is illogical because if there is a false assignment, it exists and cannot be non-existent at the same time. Either an assignment exists or it does not.

Notwithstanding, there is no assignment and Colorado law does not require an assignment of a promissory note. Bank of Bromfield v. McKinlay, 53 Colo. 279, 281 125 P. 493, 494 (1912). The Note does contain an open indorsement. And because it has a blank or open indorsement, the Note is payable to the bearer. Colo. Rev. Stat. § 4-3-205(b). Smith v. Bank of New York as Trustee, 366 B.R. 149, 152 (D. Colo. 2007).

Plaintiffs allege that the attorneys at Aronowitz engaged in this false scheme by perpetrating a false "Original Note" scam to intimidate and steal Plaintiffs' property. However, there are no factual allegations of any kind to support such a naked allegation, and there is no truth to such conclusion. Under the pleading requirements of Ashcroft v. Iqbal, such naked assertion is factually insufficient to state a claim upon which relief may be granted or to withstand the challenge of a motion to dismiss.

Plaintiffs also allege that there is a fraud on the Bankruptcy Court because Deutsche is not the holder of the original Note. Yet again, Plaintiffs have no factual basis and have not asserted any factual allegations to support such a claim. Additionally, Plaintiffs lack the requisite personal knowledge to know whether or not Deutsche is in possession of the original Note. Since this allegation is a legal conclusion rather than a factual allegation, it cannot be assumed to be true or taken in a light most favorable to Plaintiffs. Accordingly, Plaintiffs' unsupported and factually

deficient naked allegations are insufficient to state a claim upon which relief may be granted or to withstand a motion to dismiss under the pleading requirements of Ashcroft v. Iqbal.

More importantly, at the heart of Plaintiffs' baseless Adversary Proceeding Complaint for Recovery of Property, Fraud, Illegal Foreclosure, Fraudulent Transfer is a standing and real party in interest argument, which has already been decided by the Arapahoe County District Court.

C.    Plaintiffs' Claims are Barred by the *Rooker-Feldman* Doctrine

Federal district courts are empowered to exercise original, not appellate, jurisdiction. Exxon Mobil Corporation v. Saudi Basic Industries Corporation, 544 U.S. 280, 125 S.Ct. 1517, 1519, 161 L.Ed.2d 454 (2005); and Rooker v. Fidelity Trust Co., 263 U.S. 413, 415, 44 S.Ct. 149, 68 L.Ed. 362 (1923). "The *Rooker-Feldman* is confined to cases of the kind from which it acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." Id., at 281, 125 S.Ct. at 1520. Moreover, the *Rooker-Feldman* doctrine "precludes a federal district court from exercising subject matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority." Id.

The *Rooker-Feldman* doctrine also bars any "action in federal court that alleges an injury 'inextricably intertwined" with a state court decision, such that success in the federal court would require overturning the state court decision…" Epps v. Creditnet, Inc., 320 F.3d 756, 758-59 (7th Cir. 2003) (citations omitted); *see also*, Crutchfield v. Countrywide Home Loans, 389 F.3d 1144, 1148 (10th Cir. 2004).

Moreover, the *Rooker-Feldman* doctrine "precludes a federal district court from exercising subject matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority." Id. Judges in the United States District Court for the District of

Colorado have repeatedly held that the *Rooker-Feldman* doctrine bars a litigant's attempt to render this Court a *de facto* appellate court for the airing of grievances related to the Colorado Public Trustee Foreclosures. *See* <u>Rohr v. Home Loans Corporation, et al.</u>, 2005 WL 2027684, *2 (D. Colo. 2005, Judge Blackburn); <u>Murrow v. Countrywide Home Loans, Inc.</u>, 2006 WL 1659181, *1 (D. Colo. 2006, Judge Babcock); and <u>Lee v. Imperial Lending, LLC</u>, 2007 U.S. Dist. LEXIS 67847 (D. Colo. 2007).

Plaintiffs claim that the foreclosure was illegal and Deutsche "had absolutely NO RIGHT to foreclose, or even to initiate foreclosure proceedings against the subject property…" Plaintiffs seek a permanent injunction from this Court preventing Deutsche from completing the foreclosure sale. Plaintiffs seek a declaratory judgment declaring that Deutsche has no real legal interest in the subject property. Furthermore, Plaintiffs seek a declaratory judgment stating Deutsche is not in possession of the original Note and that the Note has not been assigned.

The effect of granting Plaintiffs the relief sought in their Adversary Proceeding Complaint for Recovery of Property, Fraud, Illegal Foreclosure, Fraudulent Transfer is to overturn the rulings of the Arapahoe County District Court, and which would turn this Court into an improper *de facto* appellate court.

## IV. CONCLUSION

Plaintiffs allege conclusory statements of law but lack any evidence to support those statements. Even taking the Adversary Proceeding Complaint for Recovery of Property, Fraud, Illegal Foreclosure, Fraudulent Transfer in the light most favorable to the Plaintiffs, Plaintiffs do not assert any facts of any kind, let alone facts sufficient to support a claim for relief or which may be assumed as true by this Court. As such, Plaintiffs' Adversary Proceeding Complaint for Recovery of Property, Fraud, Illegal Foreclosure, Fraudulent Transfer must be dismissed as a matter of law

because it fails to comply with the pleading requirements and because the relief sought is barred by the *Rooker-Feldman* doctrine.

WHEREFORE, Defendants, Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 Under the Pooling and Servicing Agreement Dated May 1, 2006 and Aronowitz & Mecklenburg, LLP respectfully request this Court to dismiss Plaintiffs' Adversary Proceeding Complaint for Recovery of Property, Fraud, Illegal Foreclosure, Fraudulent Transfer, and to sanction Plaintiffs for their willful disregard of this Court's rulings, along with such other and further relief this Court deems proper.

DATED:  November 19, 2010.

ARONOWITZ & MECKLENBURG, LLP

/s/ Susan J. Hendrick

Susan J. Hendrick, #33196
1199 Bannock Street
Denver, Colorado  80204
Telephone:  (303) 813-1177
Telecopier:  (303) 813-1106
Email Address:  bk@amlawco.com

E-FILED ORIGINAL
Date:  Nov 19, 2010
Document to be
retained in file of
Susan J. Hendrick

<u>Certificate of Service</u>

I hereby certify that true and correct copies of the foregoing were duly mailed, postage prepaid, on November 19, 2010, addressed as follows:

Victoria E. Edwards
511 16th St.
Ste. 420
Denver, CO 80202

Mark Stanley Miller
Jamileh Miller
19733 E Union Dr.
Centennial, CO 80015

/s/ Samantha Chilton

# FIXED/ADJUSTABLE RATE NOTE
# INTEREST ONLY FIXED PERIOD

### (1 Year LIBOR Index (As Published In *The Wall Street Journal*)-Rate Caps)

Loan # ■■■■■■                                    MIN: ■■■■■■■■■■

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

April 20, 2006                     Denver                          Colorado
   [Date]                           [City]                           [State]

19733 E Union Dr, Centennial, CO 80015

[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 216,236.00       (this amount is called "Principal"), plus interest, to the order of Lender. Lender is      IndyMac Bank, F.S.B., a federally chartered savings bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.625       %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.   PAYMENTS

### (A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on   June,   2006       . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on   May  1, 2036      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at      IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $   1,193.80       before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - 1 YEAR LIBOR INDEX - Single Family
(Fixed and Interest Only Periods are the same)

Initials: _____

Form 5602
6/05

Exhibit 1-1

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May,    2016          , and the adjustable interest rate I will pay may change on that day every    12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding    two and 750/1000ths        percentage points (    2.750        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    11.625 % or less than    2.750    %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than    2.000 percentage points from the rate of interest I have been paying for the preceding 12    months. My interest rate will never be greater than    11.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G)  Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

Loan No:  ▓▓▓▓▓▓▓

Page 2 of 5

Form 5602
6/05

Exhibit 1-2

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000       % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)  _____ (Seal)
Mark S Miller    -Borrower  Jamileh Miller    -Borrower

_____ (Seal)  _____ (Seal)
        -Borrower          -Borrower

_____ (Seal)  _____ (Seal)
        -Borrower          -Borrower

_____ (Seal)  _____ (Seal)
        -Borrower          -Borrower

Pay To The Order Of             *[Sign Original Only]*

Without Recourse
IndyMac Bank, F.S.B.
By:
Sam Lindstrom
Vice President

Loan No: ████████

Form 5602
6/05

Exhibit 1-5

## ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: ▓▓▓▓▓▓

THIS ADDENDUM is made this       20th       day of       April, 2006       , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than       11.625       % or less than       2.750       %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than   two and NO/1000ths   percentage point(s) (       2.000       %) from the rate of interest I have been paying for the preceding       12       months. My interest rate will never be greater than       11.625       % or less than       2.750       %.

**2.** All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated:   4/20/06

_____ (Seal)
Mark S Miller                                    -Borrower

_____ (Seal)
Jamileh Miller                                   -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

IndyMac Bank
ARM Note Addendum - Multistate

VMP Mortgage Solutions, Inc.

Exhibit 1-6

I074
(2/06)

20
5/8/06
MJS

After recording please return to:
IndyMac Bank, F.S.B. c/o Document Management

[Company Name]

R $116.00
D $0.00
TD
2006048620
04/25/2006   02:53:33 PM   23 Page(s)
Jefferson County, Colorado

[Name of Natural Person]

901 E. 104th Street Building B Suite 400/500
[Street Address]

Kansas City, MO 64131
[City, State Zip Code]

116⁰⁰
21

CPE

————— [Space Above This Line For Recording Data] —————

1.23

# DEED OF TRUST

MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated       April 20, 2006
together with all Riders to this document.

(B)   "Borrower" is Mark S Miller and Jamileh Miller

. Borrower is the trustor under this Security Instrument.

(C)   "Lender" is   IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a        Federal Savings Bank        organized and existing under the laws of
United States of America        . Lender's address is   155 North Lake Avenue,
Pasadena, CA 91101

(D)   "Trustee" is the Public Trustee of        Arapahoe        County, Colorado.

Loan No:

Initials: MSM JM

Exhibit 2-1

**(E)**    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

**(F)**    "Note" means the promissory note signed by Borrower and dated        April 20, 2006 .
The Note states that Borrower owes Lender     two hundred sixteen thousand two hundred thirty six and NO/100ths                         Dollars (U.S. $ 216,236.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than        May 1, 2036          .

**(G)**    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)**    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)**    "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

- [x] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) *[specify]*
- [ ] Condominium Rider
- [x] Planned Unit Development Rider
- [ ] Revocable Trust Rider
- [ ] Second Home Rider
- [ ] Biweekly Payment Rider

**(J)**    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)**    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)**    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)**    "Escrow Items" means those items that are described in Section 3.

**(N)**    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)**    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)**    "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No: ▮▮▮▮▮▮▮                                           Initials: ▮▮▮▮▮▮

MERS Modified Form 3006 01/01

Exhibit 2-2

3

**(Q)**   **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.   As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)**   **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.   This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.   For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the                    County                    of                    Arapahoe                                  :
          *[Type of Recording Jurisdiction]*                    *[Name of Recording Jurisdiction]*

See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of                          19733 E Union Dr
                                                                                   *[Street]*

Centennial                          , Colorado          80015                    ("Property Address"):

          *[City]*                                        *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants

Loan No: ▟▟▟▟▟▟                                        Initials: _____

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 3 of 13
www.compliancesource.com

Exhibit 2-3

and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and

Loan No: ███████

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 4 of 13
www.compliancesource.com

Initials: _____

Exhibit 2-4

Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

Loan No: ███████

Initials: ████████

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                Page 5 of 13
www.compliancesource.com

Exhibit 2-5

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may

Loan No: ▮▮▮▮▮▮▮▮                                                      Initials: _____

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 6 of 13
www.compliancesource.com

Exhibit 2-6

use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **6.   Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    **7.   Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    **9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

    Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

    If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    **10.   Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

Loan No: _____                         Initials: _____

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com                         Page 7 of 13

Exhibit 2-7

shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Loan No: ▓▓▓▓▓▓▓▓                                          Initials: ▓▓▓▓▓
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                           Page 8 of 13
www.compliancesource.com

Exhibit 2-8

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. 

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security

Loan No: ▆▆▆▆▆▆▆                                    Initials: ▆▆▆▆▆

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                              Page 9 of 13
www.compliancesource.com

Exhibit 2-9

Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Loan No: ███████   Initials: _____

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                  MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                                  Page 10 of 13
www.compliancesource.com

Exhibit 2-10

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Loan No: ▮▮▮▮▮▮▮▮                                         Initials ▮▮▮▮▮

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 11 of 13
www.compliancesource.com

Exhibit 2-11

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

Loan No: ████████████                                                                 Initials: ████████

Exhibit 2-12

24. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     Mark S Miller                -Borrower

                                     Mailing Address: 16255 Highway 50, Rocky Ford, CO 81067

_____     _____ (Seal)
                                     Jamileh Miller              -Borrower

                                     Mailing Address: 16255 Highway 50, Rocky Ford, CO 81067

                                     _____ (Seal)
                                                                  -Borrower

                                     Mailing Address:

                                     _____ (Seal)
                                                                  -Borrower

                                     Mailing Address:

───────────────── *[Space Below This Line For Acknowledgment]* ─────────────────

State of Colorado                    §
                                     §
County of Denver                     §

Before me the undersigned authority, on this day personally appeared   Mark S Miller and Jamileh Miller

known to me (or proved to me through an identity card or other document)
to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.
Given under my hand and seal on this   20   day of   April   2006

                                     _____
                                     Notary Public
                                     My Commission Expires: 1-3-09

CAROLYN CARTER
NOTARY
(Seal)
PUBLIC
STATE OF COLORADO

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 13 of 13
www.compliancesource.com                                                          Exhibit 2-13

EXHIBIT "A"

14

LOT 7, BLOCK 4,

FOX HILL FILING NO. 4,

COUNTY OF ARAPAHOE,

STATE OF COLORADO

Exhibit 2-14

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 20th day of April, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to IndyMac Bank, F.S.B., a federally chartered savings bank (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

**Villages of Parker**

*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No: ███████            MIN: ███████

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                            Page 1 of 3
www.compliancesource.com

Exhibit 2-15

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

—————————————————[Signatures on Following Page]—————————————————

Loan No: ██████████

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

—THE COMPLIANCE SOURCE, INC.—      Page 2 of 3

www.compliancesource.com

Form 3150 01/01

Exhibit 2-16

©20

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Mark S Miller                -Borrower

_____ (Seal)
Jamileh Miller               -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

*[Sign Original Only]*

Loan No: ████████

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 3 of 3
www.compliancesource.com

Exhibit 2-17

## FIXED/ADJUSTABLE RATE RIDER
## INTEREST ONLY FIXED PERIOD
### (LIBOR 1 Year Index (As Published In The Wall Street Journal)- Rate Caps)

Loan #  ▮▮▮▮▮▮▮                          MIN:  ▮▮▮▮▮▮▮▮▮▮

THIS FIXED/ADJUSTABLE RATE RIDER is made this 20th day of April, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to IndyMac Bank, F.S.B., a federally chartered savings bank

("Lender") of the same date and covering the property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of      6.625   %. The Note also provides for a change in the initial fixed interest rate to an adjustable interest rate, as follows:
4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May, 2016 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
(B) The Index
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - 1 Year LIBOR - Single Family
(Fixed and Interest Only Periods are the same)

Page 1 of 4                                    Form 5603
VMP Mortgage Solutions, Inc. (800)521-7291        6/05

Exhibit 2-18

19

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                                               percentage points (        2.750        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than        11.625        % or less than        2.750        %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two        percentage points from the rate of interest I have been paying for the preceding 12        months. My interest rate will never be greater than        11.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment due after the first Change Date.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No: ▓▓▓▓▓▓

Page 2 of 4

Form 5603
6/05

Exhibit 2-19

20

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

Exhibit 2-20

21

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
Mark S Miller            -Borrower       Jamileh Miller           -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

Loan No: ▬▬▬▬                Page 4 of 4                Form 5603
                                                        6/05

Exhibit 2-21

## ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #: ███████

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this 20th day of April, 2006         , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to  IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

ADDITIONAL COVENANTS. In Addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than      11.625      % or less than      2.750      %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than two and NO/1000ths                  percentage point(s) (      2.000      %) from the rate of interest I have been paying for the preceding    12    months. My interest rate will never be greater than      11.625      % or less than      2.750      %.

IndyMac Bank
ARM Addendum to Fixed/Adjustable Rate Rider
Multistate

Page 1 of 2
VMP Mortgage Solutions, Inc.

1075
2/06

Exhibit 2-22

*23*

2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and effect.

Dated: 4/20/06

_____ (Seal)
Mark S Miller          -Borrower

_____ (Seal)
Jamileh Miller          -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Page 2 of 2

I075
2/06

Exhibit 2-23

| | |
|---|---|
| **DISTRICT COURT, ARAPAHOE COUNTY, COLORADO**<br>**Court Address:** 7325 S. Potomac St.<br>Centennial, Colorado 80112 | |
| Deutsche Bank National Trust Company,<br>As Trustee Of The Indymac INDX Mortgage Loan<br>Trust 2006-AR13, Mortgage Pass-Through<br>Certificates, Series 2006-AR13 Under The Pooling<br>And Servicing Agreement Dated May 1, 2006<br><br>Petitioner:<br><br>vs.<br><br>Mark S. Milller<br>Jamileh Miller<br><br>Respondent. | 2010 APR 14 PM 12:57<br>EFILED Document<br>CO Arapahoe County District Court 18th JD<br>Filing Date: Apr 14 2010 8:24AM MDT<br>Filing ID: 30592016<br>▲ **COURT USE ONLY** ▲<br><br>**Case Number: 2010CV201323**<br><br>**Div.: 202** |
| **RESPONSE AND OBJECTION TO PETITIONER'S *MOTION FOR ORDER AUTHORIZING SALE* AND MOTION TO DISMISS** | |

    **Comes now**, Mark S. Miller and Jamileh Miller ("the Respondents"), appearing in this matter *pro se*, file their Response and Objection to Petitioner's Motion For Order Authorizing Sale and moves this Honorable Court to dismiss this matter in its entirety. In support of which, the Respondents state the following:

**I.** Respondents are the *record* owners, as joint tenants, of a property designated as 19733 E. Union Dr. Centennial, CO 80015 (hereinafter referred to as "Union Dr").

    The Petitioner's motion alleges that it is the holder of the Negotiable Instrument and the beneficiary of the Deed of Trust. However, examination of the of Respondents' Exhibit "A" entitled "Deed of Trust" reveals quite clearly that the beneficiary is MERS and **not** the Petitioner. The Petitioner does not allege that the Deed of Trust and the provisions contained in such instrument were assigned to it nor does the court record or public record contain any such transfer or assignment. Furthermore, there was no attachment to the motion itself that would indicate that the Petitioner is the assignee, beneficiary or owner of any interest whatsoever in the promissory note or deed of trust upon which this very action is based. "Rule 120 governs the very specialized civil proceeding in which an interested person may file a verified motion in court seeking the order authorizing sale under the power of sale contained in the **recorded instrument**." *Plymouth Capital Company v. District Court of Elbert County*, 955 P.2d 1014 (1998). There is no legitimate instrument, recorded or otherwise, that the Petitioner has any right or legal interest in the subject property at all. As such, this proceeding is baseless, <u>no default exists</u> and there are no valid, enforceable rights possessed by the Petitioner here.

**EXHIBIT**

**3-1**

158

**II.** Movant has failed to comply with the mandates of the Home Affordable Modification Program of 2009 ("HAMP") which specifically provides that the borrower's property be evaluated and if the HAMP eligibility criteria is met, the borrower must be given a legitimate opportunity to modify their loan and remain in her home.

> "All loans that meet the [HAMP] eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent must be evaluated using a standardized NPV [net present value] test that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, **the result is deemed 'positive' and the servicer MUST offer the modification.** If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed 'negative' and the servicer has the option of performing the modification in its discretion." *Williams v. Geithner*  2009 WL 3757380 (D.Minn.) 2009 in the United States District Court.

**III.** Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. ("FDCPA") contains a federal mandate that requires a debt collector, the Petitioner in this case as there is no legal support for any other capacity, to validate a debt prior to the commencement of any action to collect.

The Petitioner's notice purportedly sent pursuant to FDCPA is dated February 15, 2010 and was served upon the Respondents February 19, 2010.

The "Notice of Election and Demand" commencing the collection action against the Respondents filed with the Public Trustee of Arapahoe County is dated February 18, 2010, just 3 days after the date of Petitioner's notice, and recorded with the Arapahoe County Clerk and Recorder on February 24, 2010.

The Respondents disputed the debt on March 10, 2010 well within the 30 days allowed by FDCPA.

Not only did the Petitioner not validate the purported debt as the law requires, but it did not comply with the 30 day period within which the Respondent was entitled in order to dispute the debt.

**IV.** The burden of pleading and proving a party's standing in an action to foreclose is upon those who assert it. *Howard v. Fisher*, 86 Colo. 493, 283 P.2d 1042 (1929). In order to establish standing, the Petitioner must demonstrate that it satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). That is: 1) whether the Petitioner was injured in fact and; 2) whether the injury was a *legally protected right*. Above all, standing is an issue of law that concerns a court's subject matter jurisdiction. *Durdin v. Cheyenne Mtn Bank*, 98 P.3d 899 (Colo.App.2004).

EXHIBIT

3-2

2

Simply put, this Petitioner has deliberately, *on its face*, violated a plethora of mandated federal requirements associated with the validation and collection of this purported debt. Moreover, the Petitioner has no interest in this property, no right to cloud the title to this property with this action and finally, this case must be dismissed for failure to put forth a cause of action of any kind because it lacks any interest to support its claim to foreclose, rendering its pleadings in this matter insufficient in law and in fact.

**Wherefore**, the Respondents pray that this court deny the Petitioners' motion and dismiss this matter for failure to plead any legitimate interest and further, deny any related sale in the Arapahoe County Public trustee's office.

Respectfully submitted this April 14, 2010.

_____          _____
Mark S. Milller                    Jamileh Miller


## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing **Response and Objection to Motion for Order Authorizing Sale and Motion to Dismiss** was served on opposing parties by hand delivering or mailing the same, on this day, April 14, 2010 to the following address:

Aronowitz & Mecklenburg, LLP
1099 Bannock Street
Denver, CO 80205

_____
Jamileh Miller

EXHIBIT

3 - 3

3

<table>
<tr>
<td>

**DISTRICT COURT, ARAPAHOE COUNTY, COLORADO**
Court Address: 7325 S. Potomac St.
           Centennial, Colorado 80112

---

Deutsche Bank National Trust Company,
As Trustee Of The Indymac INDX Mortgage Loan
Trust 2006-AR13, Mortgage Pass-Through
Certificates, Series 2006-AR13 Under The Pooling
And Servicing Agreement Dated May 1, 2006

Petitioner:

vs.

Mark S. Miller
Jamileh Miller

Respondent.

</td>
<td>

ARAPAHOE COUNTY, COLO

**2010 MAY -4  AM 8: 56**

EFILED Document
CO Arapahoe County District Court 18th JD
Filing Date: May 4 2010 2:48PM MDT
Filing ID: 30948504

▲ **COURT USE ONLY** ▲

---

**Case Number: 2010CV201323**

**Div.: 202**

</td>
</tr>
</table>

---

### MOTION FOR HEARING ON JURISDICTION

---

**Comes now,** Mark S. Miller and Jamileh Miller ("the Respondents"), appearing in this matter *pro se*, file their Motion for Hearing on Jurisdiction and moves this Honorable Court to dismiss this matter in its entirety. In support of which, the Respondents state the following:

1. Respondents are the *record* owners, as joint tenants, of a property designated as 19733 E. Union Dr. Centennial, CO 80015 (hereinafter referred to as "Union Dr").

2. The Petitioner has asked this court for an order authorizing the sale of Respondents' home.

3. The court held a hearing on the Petitioner's motion whereby Petitioner failed to present any evidence whatsoever to this court to support its standing to bring this action against Respondents' home **whether or not there is an issue of default.**

4. This proceeding is narrow in scope as this court is aware. Moreover, standing to bring such a proceeding stems from an interest recorded in the public record which the Petitioner here does not have and has made no effort to present such evidence to the court. This court cannot ignore this as the court's authority to hear or rule on this matter rests on Petitioner's standing to even be here.

5. The burden of pleading and proving a party's standing in an action to foreclose is upon those who assert it. *Howard v. Fisher*, 86 Colo. 493, 283 P.2d 1042 (1929). In

EXHIBIT

4 — 1

1

order to establish standing, the Petitioner must demonstrate that it satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). That is: 1) whether the Petitioner was injured in fact and; 2) whether the injury was a *legally protected right*. Above all, standing is an issue of law that concerns a court's subject matter jurisdiction. *Durdin v. Cheyenne Mtn Bank*, 98 P.3d 899 (Colo.App.2004).

6. Absent standing to bring this action against Respondents' home, this court lacks jurisdiction or authority of any kind to hear or rule on the Petitioner's motion or grant the relief so requested.

7. The Respondents move this court for a hearing to determine the jurisdiction of this court to decide this matter.

Respectfully submitted this May 4, 2010.

_____          _____
Mark S. Milller                     Jamileh Miller

### CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing **Motion for Hearing on Jurisdiction** was served on opposing parties by hand delivering or mailing the same, on this day, May 4, 2010 to the following address:

Aronowitz & Mecklenburg, LLP
1099 Bannock Street
Denver, CO 80205

_____
Jamileh Miller

EXHIBIT
4 - 2



GRANTED
WITH
AMENDMENTS

The moving party is hereby ORDERED to provide a copy of this Order to any pro se parties who have entered an appearance in this action within 10 days from the date of this order.

Charles M. Pratt
District Court Judge
DATE OF ORDER INDICATED ON ATTACHMENT

0827-2010

| DISTRICT COURT, ARAPAHOE COUNTY, COLORADO<br>Court Address:7325 S. Potomac St. Centennial, CO 80112<br><br>IN THE MATTER OF THE APPLICATION OF DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, FOR AN ORDER AUTHORIZING THE PUBLIC TRUSTEE FOR ARAPAHOE COUNTY, STATE OF COLORADO, TO SELL CERTAIN REAL ESTATE CONTAINED IN A DEED OF TRUST. | EFILED Document<br>CO Arapahoe County District Court 18th JD<br>Filing Date: May 6 2010 10:28AM MDT<br>Filing ID: 30962267<br>Review Clerk: N/A<br><br>▲ COURT USE ONLY ▲<br><br>Case Number:<br>2010 CV<br><br>Div.:          Ctrm: |

ORDER AUTHORIZING SALE

THE REVIEW AND HEARING IN THIS MATTER having been completed by the Court on April 19, 2010:

WHEREAS, Mark S Miller and Jamileh Miller, Grantor(s) by Deed of Trust dated April 20, 2006, and recorded March 19, 2007 as Reception No. B7034459, in the records of the County of Arapahoe, Colorado, to secure to Mortgage Electronic Registration Systems, Inc., acting solely as nominee for IndyMac Bank, F.S.B., the payment of a Negotiable Instrument of even date therewith for the principal sum of $216,236.00, as provided in said Deed of Trust, conveyed to the Arapahoe County Public Trustee, on the terms set forth in said Negotiable Instrument and Deed of Trust, the following described real property ("Property") situate in said County to-wit:

LOT 7, BLOCK 4, FOX HILL FILING NO. 4, COUNTY OF ARAPAHOE, STATE OF COLORADO

WHICH HAS THE ADDRESS OF : 19733 E Union Dr, Centennial, CO 80015

THE COURT FINDS that there is reasonable probability that:  a default exists as alleged

EXHIBIT
5-1

in the Motion in order to invoke the power of sale in said Deed of Trust; that the provisions of C.R.C.P. Rule 120 and the Servicemembers Civil Relief Act, as amended, have been complied with; that the venue in this action is proper; and that the order authorizing sale should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that a sale of the Property by the Public Trustee in the above said County in the State of Colorado, under a power of sale, pursuant to statute and the provisions of that certain Deed of Trust described above, be and the same hereby is authorized by this Court.

It is further ordered that a return of such sale shall be made to this Court for its approval.

DATED:_____, *nunc pro tunc* to April 19, 2010.

BY THE COURT:

District Judge/Magistrate

Mark S Miller and Jamileh Miller 3500.00832

EXHIBIT

5 - 2

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---|---|
| **Court:** | CO Arapahoe County District Court 18th JD |
| **Judge:** | Christopher Charles Cross |
| **File & Serve Transaction ID:** | 30187689 |
| **Current Date:** | May 06, 2010 |
| **Case Number:** | 2010CV201323 |
| **Case Name:** | DEUTSCHE BANK NATIONAL TRUST COMPANY AS vs. MILLER, MARK S et al |

**Court Authorizer Comments:**

The issue before the Court is whether the party seeking the ordar authroizing sale is an "interested person" as that term is used in C.R.C.P. 120. A copy of the note is attached to the motion requesting an order authroising sale. The note on page 6 below the respodants' signatures is endorsed in blank by Lender. No evidence has been persented to suggest that the endorsement is not genuine or that the petetioner is not in possession of the orginal note. The petetioner is entitled to an order authroising sale.

/s/ Judge Charles M Pratt

EXHIBIT
S-3

**DISTRICT COURT, ARAPAHOE COUNTY, COLORADO**
Court Address: 7325 S. Potomac St.
Centennial, Colorado 80112

Deutsche Bank National Trust Company,
As Trustee Of The Indymac INDX Mortgage Loan
Trust 2006-AR13, Mortgage Pass-Through
Certificates, Series 2006-AR13 Under The Pooling
And Servicing Agreement Dated May 1, 2006

Petitioner:

vs.

Mark S. Miller
Jamileh Miller

Respondent.

EFILED D... 2010 MAY -7 PM 2:28
CO Arapahoe County District Court 18th JD
Filing Date: May 7 2010 9:27AM MDT
Filing ID: 31009969

▲ **COURT USE ONLY** ▲

**Case Number: 2010CV201323**

**Div.: 202**

## 2^nd^ MOTION FOR HEARING ON JURISDICTION

**Comes now**, Mark S. Miller and Jamileh Miller ("the Respondents"), appearing in this matter *pro se*, file their Motion for Hearing on Jurisdiction and moves this Honorable Court to dismiss this matter in its entirety. In support of which, the Respondents state the following:

1. Respondents are the *record* owners, as joint tenants, of a property designated as 19733 E. Union Dr. Centennial, CO 80015 (hereinafter referred to as "Union Dr").

2. The Petitioner has asked this court for an order authorizing the sale of Respondents' home.

3. The court held a hearing on the Petitioner's motion whereby Petitioner failed to present any evidence whatsoever to this court to support its standing to bring this action against Respondents' home **whether or not there is an issue of default.**

4. This proceeding is narrow in scope as this court is aware. Moreover, standing to bring such a proceeding stems from an interest recorded in the public record which the Petitioner here does not have and has made no effort to present such evidence to the court. This court cannot ignore this as the court's authority to hear or rule on this matter rests on Petitioner's standing to even be here.

5. The burden of pleading and proving a party's standing in an action to foreclose is upon those who assert it. *Howard v. Fisher*, 86 Colo. 493, 283 P.2d 1042 (1929). In

EXHIBIT

6-1

1

order to establish standing, the Petitioner must demonstrate that it satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). That is: 1) whether the Petitioner was injured in fact and; 2) whether the injury was a *legally protected right*. Above all, standing is an issue of law that concerns a court's subject matter jurisdiction. *Durdin v. Cheyenne Mtn Bank*, 98 P.3d 899 (Colo.App.2004).

6. Absent standing to bring this action against Respondents' home, this court lacks jurisdiction or authority of any kind to hear or rule on the Petitioner's motion or grant the relief so requested.

7. The Respondents move this court for a hearing to determine the jurisdiction of this court to decide this matter.

Respectfully submitted this May 7, 2010.

Mark S. Miller                                Jamileh Miller

CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing **Motion for Hearing on Jurisdiction** was served on opposing parties by hand delivering or mailing the same, on this day, May 7, 2010 to the following address:

Aronowitz & Mecklenburg, LLP
1099 Bannock Street
Denver, CO 80205

Jamileh Miller

EXHIBIT

6-2



**DENIED**

The moving party is hereby ORDERED to provide a copy of this Order to any pro se parties who have entered an appearance in this action within 10 days from the date of this order.

~~Christopher C. Cross~~
**Christopher C. Cross**
**District Court Judge**
DATE OF ORDER INDICATED ON ATTACHMENT

---

Deutsche Bank National Trust Company, As Trustee Of The Indymac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 Under The Pooling And Servicing Agreement Dated May 1, 2006

Petitioner:

vs.

Mark S. Miller
Jamileh Miller

Respondent.

EFILED Document
CO Arapahoe County District Court 18th JD
Filing Date: Jun 13 2010 5:31PM MDT
Filing ID: 31608104
Review Clerk: N/A

▲ **COURT USE ONLY** ▲

**Case Number: 2010CV201323**

**Div.: 202**

---

## 2nd MOTION FOR HEARING ON JURISDICTION

**Comes now**, Mark S. Miller and Jamileh Miller ("the Respondents"), appearing in this matter *pro se*, file their Motion for Hearing on Jurisdiction and moves this Honorable Court to dismiss this matter in its entirety. In support of which, the Respondents state the following:

1. Respondents are the *record* owners, as joint tenants, of a property designated as 19733 E. Union Dr. Centennial, CO 80015 (hereinafter referred to as "Union Dr").

2. The Petitioner has asked this court for an order authorizing the sale of Respondents' home.

3. The court held a hearing on the Petitioner's motion whereby Petitioner failed to present any evidence whatsoever to this court to support its standing to bring this action against Respondents' home **whether or not there is an issue of default.**

4. This proceeding is narrow in scope as this court is aware. Moreover, standing to bring such a proceeding stems from an interest recorded in the public record which the Petitioner here does not have and has made no effort to present such evidence to the court. This court cannot ignore this as the court's authority to hear or rule on this matter rests on Petitioner's standing to even be here.

5. The burden of pleading and proving a party's standing in an action to foreclose is upon those who assert it. *Howard v. Fisher*, 86 Colo. 493, 283 P.2d 1042 (1929). In

EXHIBIT

7 - 1

order to establish standing, the Petitioner must demonstrate that it satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). That is: 1) whether the Petitioner was injured in fact and; 2) whether the injury was a *legally protected right*. Above all, standing is an issue of law that concerns a court's subject matter jurisdiction. *Durdin v. Cheyenne Mtn Bank*, 98 P.3d 899 (Colo.App.2004).

6. Absent standing to bring this action against Respondents' home, this court lacks jurisdiction or authority of any kind to hear or rule on the Petitioner's motion or grant the relief so requested.

7. The Respondents move this court for a hearing to determine the jurisdiction of this court to decide this matter.

Respectfully submitted this May 7, 2010.

_____          _____
Mark S. Miller                      Jamileh Miller

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing **Motion for Hearing on Jurisdiction** was served on opposing parties by hand delivering or mailing the same, on this day, May 7, 2010 to the following address:

Aronowitz & Mecklenburg, LLP
1099 Bannock Street
Denver, CO 80205

_____
Jamileh Miller

EXHIBIT

?-2

2

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---|---|
| **Court:** | CO Arapahoe County District Court 18th JD |
| **Judge:** | Christopher Charles Cross |
| **File & Serve Transaction ID:** | 31009909 |
| **Current Date:** | Jun 13, 2010 |
| **Case Number:** | 2010CV201323 |
| **Case Name:** | DEUTSCHE BANK NATIONAL TRUST COMPANY AS vs. MILLER, MARK S et al |

**Court Authorizer Comments:**

Plaaintff has established jurisdiction in its pleadings. The defendant has not specified a legal reason why jurisdiction has not been established.

/s/ Judge Christopher Charles Cross

EXHIBIT
7-3